# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

PLANNED PARENTHOOD OF
SOUTHWEST AND CENTRAL
FLORIDA and PLANNED
PARENTHOOD OF SOUTH FLORIDA
AND THE TREASURE COAST
d/b/a PLANNED PARENTHOOD
OF SOUTH, EAST, AND NORTH FLORIDA,

      Plaintiffs,

v.                      CASE NO.  4:16cv321-RH/CAS

CELESTE PHILIP, in her
official capacity as State
Surgeon General and Secretary
of Health, Florida Department of
Health, and ELIZABETH DUDEK,
in her official capacity as Secretary,
Florida Agency for Health Care Administration,

      Defendants.

_____/

## <u>PRELIMINARY INJUNCTION</u>

      This case presents a challenge to newly enacted Florida legislation that

targets abortion providers.  The plaintiffs—entities that provide abortions and

other, unrelated services—assert that three provisions are unconstitutional.  The

first provision blocks abortion providers from receiving funds from the state and local governments, under contracts or otherwise, for providing services wholly unrelated to abortions.  The second provision requires state officials to inspect the medical records of 50% of all abortion patients—a percentage far in excess of the requirement for other medical providers.  The third provision defines the trimesters of a pregnancy—an important component of Florida's regulatory scheme—using terminology different from accepted medical terminology; the plaintiffs say the definition is vague.

The plaintiffs have moved for a preliminary injunction.

## I.  Background

The plaintiffs are Planned Parenthood of Southwest and Central Florida, Inc., and Planned Parenthood of South Florida and the Treasure Coast, Inc., doing business as Planned Parenthood of South, East, and North Florida.  They provide abortions through licensed clinics.  They also provide other services having nothing to do with abortions, including testing for sexually transmitted diseases, screenings for breast and cervical cancer, family-planning services and education, vasectomies, and a program that provides academic support and attempts to prevent teens from dropping out of school.  The plaintiffs provide these services at little or no cost to patients.

Earlier this year, the Florida Legislature amended the Florida abortion statute.  *See* Ch. 16-150, Laws of Florida.  The amendments are scheduled to take effect on July 1, 2016.

The plaintiffs filed this action asserting three of the amended provisions are unconstitutional.  The plaintiffs named as defendants two state officials—the Surgeon General (who is also the Secretary of the Department of Health) and the Secretary of the Agency for Health Care Administration—both in their official capacities.  These officials have a role in enforcing the challenged provisions.

The first challenged provision—the "defunding provision"—is Florida Statutes § 390.0111(15).  It provides that a state agency, local government entity, or Medicaid managed-care plan "may not expend funds for the benefit of, pay funds to, or initiate or renew a contract with an organization that owns, operates, or is affiliated with one or more clinics that are licensed under this chapter and perform abortions," subject to specific exceptions.  The exceptions are for contracts entered into before the provision's effective date, funds payable on a fee-for-service basis under the Medicaid statute, and funds paid to clinics that perform abortions only in limited circumstances—circumstances much narrower than encompassed by a woman's constitutional right to an abortion.

The second challenged provision—the "inspection provision"—is Florida Statutes § 390.012(1)(c)2.  Florida law has long required abortion clinics to keep

medical records and to undergo annual inspections by the Agency for Health Care Administration.  The records include highly sensitive personal information on topics including medical history, contraceptive practices, sexual history, HIV status, and mental health.  AHCA has typically reviewed the records of 15 to 20 patients as part of its inspection of a clinic.  The amendment requires AHCA to "inspect at least 50 percent of patient records generated since the clinic's last license inspection."  This will mean as many as 700 records at a single clinic.  AHCA's cost of conducting the inspections apparently will be rolled into license fees.  *See* Fla. Stat. § 390.014(3).

The third challenged provision—the "trimester definition"—is Florida Statutes § 390.011(12)(a).  It defines the trimesters of a pregnancy.  The statute defines the "first trimester" as "the period of time from fertilization through the end of the 11th week of gestation."  This is important because it controls which clinics may perform an abortion for a given patient and what procedures must be used.

The plaintiffs moved for a preliminary injunction.  By agreement of both sides, the evidence consists of declarations, not live testimony.  The parties have fully briefed the motion and have presented oral argument.

## II. The Preliminary-Injunction Standard

As a prerequisite to a preliminary injunction, a plaintiff must establish a substantial likelihood of success on the merits, that the plaintiff will suffer irreparable injury if the injunction does not issue, that the threatened injury outweighs whatever damage the proposed injunction may cause a defendant, and that the injunction will not be adverse to the public interest.  *See*, *e.g.*, *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

This order addresses likelihood of success on the three challenged provisions in sections III, IV, and V.  The order addresses the other prerequisites to a preliminary injunction in section VI.  The order addresses the requirement for security in section VII.

A preliminary note: this order addresses the issues based on the record as compiled to this point and reaches legal conclusions based on likelihood of success.  The merits have not been consolidated with the preliminary-injunction proceedings.  This is not a final judgment on the merits.

## III. The Defunding Provision

The United States and the State of Florida, like many other states, have long prohibited the use of public funds to provide or support abortions.  That such measures are constitutional was settled long ago.  *See, e.g.*, *Maher v. Roe*, 432 U.S.

464 (1977).  As recognized there, a state may choose to prefer child birth over abortion and to allocate its resources accordingly.

This case is different.  Before the defunding provision was adopted, Florida law already prohibited the use of state or local funds to provide or support abortions.  The defunding provision goes further and refuses to fund services that are wholly *unrelated* to abortions.  The provision does this based not on any objection to how the funds are being spent—on things like testing for sexually transmitted disease or dropout prevention—and not based on any objection to the quality of services being provided, but solely because the recipients of the funds choose to provide abortions separate and apart from any public funding—as the Supreme Court has put it, on their "own time and dime."  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2330 (2013).

This brings into play the unconstitutional-conditions doctrine.  Under the defunding provision, as a condition of receiving state or local funds for unrelated services, the plaintiffs must stop providing abortions that women are constitutionally entitled to obtain.  But as the defendants acknowledged at oral argument, the state could not constitutionally prohibit the plaintiffs from providing these abortions.  The Supreme Court has repeatedly said that a government cannot prohibit indirectly—by withholding otherwise-available public funds—conduct that the government could not constitutionally prohibit directly.

Two Supreme Court decisions illustrate the point.

First, in *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006), the plaintiffs challenged the "Solomon Amendment," under which a university would lose its federal funding if its law school did not give military recruiters the same access as other prospective employers to the law school's students. The plaintiffs said this was an unconstitutional condition on the receipt of federal funds. The Supreme Court discussed the principle established by its earlier cases on funding conditions and succinctly framed the issue:

> Under this principle, known as the unconstitutional conditions doctrine, the Solomon Amendment *would be unconstitutional if Congress could not directly require universities to provide military recruiters equal access to their students*.
>
> . . . Because the First Amendment would not prevent Congress from directly imposing the Solomon Amendment's access requirement, the statute does not place an unconstitutional condition on the receipt of federal funds.

*Id.* at 59-60 (emphasis added).

The teaching of the case is this: a legislature can condition public funding on a recipient's unrelated activity (or its abstinence from an unrelated activity) if the legislature could directly require the recipient to engage in (or abstain from) that unrelated activity. In *Forum*, the challenged condition was constitutional, because Congress could directly require a law school to give military recruiters equal

access to its students.  Here, in contrast, the state could not directly prohibit the plaintiffs from providing abortions.

Second, in *Agency for International Development v. Alliance for Open Society International, Inc.*, 133 S. Ct. 2321 (2013), Congress funded efforts of nongovernmental organizations to combat the spread of HIV and AIDS but conditioned the funding on an organization's adoption of a policy opposing prostitution.  The Court again invoked the unconstitutional-conditions doctrine. Rejecting the dissent's contention that the doctrine applies "when the condition is not relevant to the objectives of the [federally funded] program"—a limitation that in any event would not help the defendants in the case at bar—the Court said:

> Our precedents, however, are not so limited. In the present context, the relevant distinction that has emerged from our cases is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself.

*Id.* at 2328.

This "relevant distinction" puts the defunding provision at issue here squarely on the unconstitutional side of the line.  The defunding provision has nothing to do with the state and local spending programs at issue, which address things like testing for sexually transmitted disease and dropout prevention.  The defunding provision is instead an effort to leverage the funding of those programs to reach abortion services.  Indeed, the separation between the funding and the

condition could not be clearer: nobody has contended that the plaintiffs have done anything in connection with the publicly funded programs that is inconsistent in any way with the goals of those programs. The state's only beef is that the plaintiffs provide abortions.

In sum, *Forum* and *Alliance*, together with the other Supreme Court decisions they cite, recognize the unconstitutional-conditions doctrine and adopt standards for applying the doctrine that are flatly inconsistent with the Florida defunding provision. There are just two relevant differences between *Forum* and *Alliance*, on the one hand, and the Florida defunding provision, on the other hand.

First, in *Forum* and *Alliance*, the constitutional right at issue belonged to the plaintiffs themselves. Here, in contrast, the constitutional right at issue—or, at least, the primary constitutional right at issue—belongs to the plaintiffs' *patients*. A patient has a right to an abortion, within limits. *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, No. 15-274 (U.S. June 27, 2016); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1982); *Roe v. Wade*, 410 U.S. 113 (1973). The plaintiffs have a right to provide abortions, but the right is derivative of the patients' rights.

Second, in *Forum* and *Alliance*, the constitutional right at issue arose under the First Amendment.

As it turns out, neither difference makes a difference, as Supreme Court and Eleventh Circuit decisions make clear.

In *Rust v. Sullivan*, 500 U.S. 173 (1991), the Supreme Court addressed Title X of the Public Health Services Act, which provided federal funding for family-planning services but prohibited the use of the federal funds for family-planning methods that included abortion.  Abortion providers challenged the restriction, invoking the unconstitutional-conditions doctrine.  They invoked their own First Amendment rights as well as the rights of their patients.  The Court gave not the slightest hint that that distinction made a difference for purposes of the unconstitutional-conditions doctrine.  Instead, the Court applied the same principle it would later apply in *Forum* and *Alliance*: Congress can impose conditions on the use of a federal subsidy, but Congress cannot "place[] a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program."  *Id.* at 197 (emphasis in original).

The Court upheld the Title X restriction on use of the federal funds, emphasizing that the statute left a recipient "unfettered in its other activities"; a recipient could "continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it simply [was] required to conduct those activities through programs that [were] separate and independent from the project

that receive[d] Title X funds." *Id.* at 196.  This language draws no distinction between the recipients' own rights and those derived from their patients; instead, the Court gave equal billing to performing abortions (a right derived from patients) and abortion advocacy (a right held directly by the recipients).  The Court's analysis leaves no room for any assertion that as a condition of receiving Title X funds, Congress could have prohibited a recipient from performing abortions, on the ground that the right to an abortion was only that of the patient, not a right of the recipient.

If, as the Court said in *Rust*, Congress can prohibit the use of federal funds for abortion services but cannot restrict a recipient of federal funds from separately providing abortion services, then the Florida legislature likewise can prohibit the use of state funds for abortion services but cannot prohibit a recipient of state funds from separately providing abortion services.  *Rust* is fatal to the defunding provision, which was enacted precisely and only for a prohibited purpose: to reach other, unrelated activities that are separate from the recipient's abortion services.  That this was the only purpose of the defunding provision is clear because Florida law already prohibited the use of state funds for abortions.

To be sure, *Rust* upheld a requirement for adequate separation of abortion and non-abortion-related services.  But that makes no difference here.  The defunding provision does not impose a requirement for adequate separation.

Instead, the provision flatly defunds abortion providers, no matter how thoroughly they separate abortion and non-abortion-related services.  And while, without adequate separation, one might reasonably fear that money paid for a recipient's non-abortion-related services could indirectly support the provision of abortions—money, after all, is fungible—the contention that this defeats the plaintiffs' claim here fails both on the facts and on the law.

On the facts, the plaintiffs have submitted proof, unrebutted at this point, that their non-abortion-related government-funded programs are net losers.  A program that costs more than it brings in cannot indirectly support an unrelated program.

On the law, the Supreme Court has made clear that the cross-funding argument does not prevent application of the unconstitutional-conditions doctrine. In *Alliance*, 133 S. Ct. at 2331, the government made the same argument, but the Court emphatically rejected it.  The Court said the government had offered no support for the assumption that cross-funding would occur as a general matter or any reason to believe it would occur in that case.  And the Court said the argument was contrary to the holding of one recent Supreme Court decision and inconsistent with the reasoning of two others.  Here, as in *Alliance*, the defendants have offered no support for any assertion that cross-funding could occur.

That brings us to the defendants' assertion that the unconstitutional-conditions doctrine is limited to the First Amendment.  The Supreme Court squarely rejected the contention in *Koontz v. St. Johns River Water Management District*, 133 S. Ct. 2586 (2013).  There the Court applied the unconstitutional-conditions doctrine based on the Fifth Amendment right to just compensation.  And the Court described the doctrine in language that leaves no room for any assertion that the doctrine is limited to the First Amendment:

> We have said in a variety of contexts that "the government may not deny a benefit to a person because he exercises a constitutional right." . . .  [Prior] cases reflect an overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up.

*Id.* at 2594.

The Eleventh Circuit, too, has applied the unconstitutional-conditions doctrine beyond the First Amendment.  In *Lebron v. Secretary, Florida Department of Children & Families*, 710 F.3d 1202 (11th Cir. 2013), the court applied the doctrine based on the Fourth Amendment, striking down Florida's program for drug-testing applicants for financial assistance.  In language squarely applicable here, the court added: "the state cannot accomplish indirectly that which it has been constitutionally prohibited from doing directly."  *Id.* at 1217.

The reference in *Koontz* to "coercion" also does not help the defendants.  They say the plaintiffs were not actually coerced—they have not stopped providing

abortions, and have no plans to do so—but the same was true in *Koontz*; there, as here, the affected party did not yield to the coercion.  The Court said this did not matter.  *Id.* at 2596.  *See also Alliance*, 133 S. Ct. at 2328 (rejecting the assertion that the unconstitutional-conditions doctrine requires actual coercion).

In sum, the defunding provision does not survive the unconstitutional-conditions doctrine.  Unable to rebut this conclusion, the defendants implicitly assert, in effect, that the doctrine does not apply in the abortion context at all.  The defendants assert that the only constitutional restriction on abortion legislation is that recognized in *Whole Woman's Health* and *Casey*: the state cannot impose an "undue burden" on a woman's right to an abortion.  *Whole Woman's Health*, slip op. at 1-2.  The plaintiffs have not shown that the defunding provision will impose an actual, undue burden on the patients' right to an abortion, because the plaintiffs intend to continue providing abortions.

The defendants' assertion that the unconstitutional-conditions doctrine does not apply in this context is incorrect.  Nothing in *Whole Woman's Health* or *Casey* suggests in any way that those decisions were intended to supplant the wholly separate unconstitutional-conditions doctrine.  And *Rust*'s analysis is squarely to the contrary.  No court has embraced the defendants' position.  And there is no logic to it.  That a woman has a constitutional right to an abortion does not mean a legislature can impose otherwise-unconstitutional conditions on public funding.

This conclusion makes it unnecessary to address a separate contention advanced by the plaintiffs: that the defunding provision is "inexplicable by anything other than animus toward the class it affects" and thus "lacks a rational relationship to legitimate state interests." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

The plaintiffs are likely to prevail on the merits of their challenge to the defunding provision.

### IV. The Inspection Provision

The plaintiffs next challenge the inspection provision, under which each of the plaintiffs' abortion clinics will undergo annual inspections at which state employees will examine the medical records of 50% of the clinic's patients. The defendants have offered no legitimate explanation for the requirement, asserting only that the clinics' records are already subject to inspection, and that increasing the number of records that are inspected thus cannot be unconstitutional. Other medical providers, including ambulatory surgical centers, perform more complicated procedures and have more adverse outcomes, but the percentage of their records that are inspected is lower by orders of magnitude.

The state has inspected the plaintiffs' clinics for years. The inspections have turned up no violations. For all that is shown by this record, the inspection provision is a solution in search of a problem.

Patients have a substantial interest in the privacy of these records.  Indeed, the Eleventh Circuit has recognized that there is a constitutional right to confidentiality and that information of this kind is among that most deserving of protection.  *See Hester v. City of Milledgeville*, 777 F.2d 1492, 1497 (11th Cir. 1985).  There the court said "the constitutionality of state action alleged to have violated this right to confidentiality must be determined by use of a balancing test: by 'comparing the interests [the action] serves with those it hinders.' "  *Id.* at 1497 (bracketing by the court) (quoting *Plante v. Gonzalez*, 575 F.2d 1119, 1134 (5th Cir. 1978)).

There have been no known breaches of confidentiality caused by state inspections, but neither has there been a state inspection program on this scale reaching records that are this sensitive.  And even if the records are seen only by a state inspector, this, too, compromises the patients' interest in privacy.  *See James v. City of Douglas*, 941 F.2d 1539 (11th Cir. 1991).  Patients have an interest in minimizing the spread of their private information, even among medical professionals and inspectors who have a reason to see the information and an obligation to maintain a high level of professionalism.  *See id.* at 1544 ("The inquiry is whether there is a legitimate state interest in disclosure that outweighs the threat to the plaintiff's privacy interest. The answer to that inquiry does not

depend upon whether the person to whom disclosure was made is a state official or a member of the general public.").

This does not mean that an abortion clinic's records cannot be inspected. The balance mandated by *Hester* would almost surely be struck in favor of a reasonable inspection program—one that starts with a sample of an appropriate size and goes further only if the results or other circumstances warrant doing so. The plaintiffs do not assert the contrary. But the balance is easily struck in favor of privacy when the state demands to inspect 50% of the records and cannot offer any legitimate reason for doing so.

The plaintiffs assert that the inspection program also violates the Fourth Amendment. A government official's demand to see records of this kind is sometimes labeled an administrative search. The Fourth Amendment allows such a search without a warrant, but only when the government makes available an opportunity for pre-enforcement review of the official's demand to come in or to see records. *See City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015); *Marshall v. Barlow's, Inc.*, 98 S. Ct. 1816 (1978). Here the state apparently has not made available an opportunity for pre-enforcement review. This, standing alone, renders the state's system facially unconstitutional.

The plaintiffs' real complaint, though, is not the absence of pre-enforcement review but the burden that an inspection this extensive will impose, in addition to

the effect on privacy.  The defendants say this is a heavily regulated industry, under which the standards for administrative searches are relaxed.  But the contention does not help the defendants, for two reasons.  First, in *Patel*, the Supreme Court said it had recognized only four industries as heavily regulated. Abortion clinics bear no resemblance to any of the four and are unlikely to make it into this category.  Second, even for heavily regulated industries, an administrative search must be necessary to serve a substantial governmental interest.  *See New York v. Burger*, 482 U.S. 691, 702-03 (1987).  Inspecting an abortion clinic at an appropriate level may meet that standard.  Inspecting 50% of the clinic's records, absent any cause for concern, does not.

The plaintiffs are likely to prevail on their challenge to the inspection provision.

## V. The Trimester Definition

Florida licenses abortion clinics at two levels.  The lower-level license, referred to in this order as Level I, authorizes the clinic to provide abortions early in a pregnancy—in roughly the first trimester, though the precise period is the issue now in dispute.  The higher-level license, referred to in this order as Level II, authorizes the clinic to provide abortions later (as well as earlier) in a pregnancy. At either level, there are limitations, but those are not now at issue.

The dividing line between abortions that require a Level II license and those that may be performed in a Level I facility is important in determining both where an abortion may be performed and the procedures that must be used.  For a procedure that may be performed only at a Level II facility, an intravenous line must be in place, and the patient must undergo a urine or blood pregnancy test.

Gestational age is important in assessing proper care during pregnancy and in making decisions on such things as whether and when to induce labor.  So physicians have long measured gestational age for reasons having nothing to do with abortions—and, even more clearly, for reasons having nothing to do with the constitutional standards that govern abortions.

Physicians measure gestational age from the onset of the last menstrual period, not from the date of conception.  The reason for this is probably historic: until relatively recently, the most reliable indicator of gestational age was usually the mother's memory of her last menstrual period.  Now, sonograms provide more reliable information, but the convention of measuring gestational age from the last menstrual period (or "LMP") has persisted.  The LMP is ordinarily about two weeks before conception—so when a sonogram shows that conception probably occurred six weeks ago, the physician concludes that the gestational age is eight weeks.  Physicians use a dot to separate weeks from days, so a gestational age of 8.2 indicates that the LMP was eight weeks, two days ago, or, expressed

differently, that conception occurred six weeks, two days ago.  There are accepted standards in the profession for estimating gestational age from sonograms.

The Legislature's new definition changes the terminology, abandoning the profession's use of time since LMP, and substituting time since conception. Leaving aside the question of why a legislator would wish to substitute the new terminology for that long accepted in the profession, the difference in terminology makes no real difference, so long as nothing is lost in the translation.

So the change to time-since-conception is of no real consequence.  But there is another issue: the gestational age at which a patient must go to a Level II facility, must have an open intravenous line, and must submit to a blood or urine pregnancy test.  Before the amendment, the critical gestational age (measured from LMP) was 13.6 or 13 weeks, 6 days.  Using the amendment's approach—time since conception—this equates to 11.6 or 11 weeks, 6 days.  If the amendment retains this same critical date—what a physician would label 13.6—the amendment has made no substantive change.

The difficulty arises from the amendment's description of the critical date. The amendment says it is the "end of the 11th week of gestation."  The plaintiffs say this is vague—that one could read this to mean, in the terminology of physicians, either 12.6 or 13.6.

The contention is not without force.  One might think the end of the 11th week since conception is the 77th day since conception—the point that would be expressed as 11.0 (using the date of conception) or 13.0 (using LMP).  This would move the critical date six days earlier than under prior law.

The record suggests no medical justification for moving the date earlier, and the defendants have offered none.  Using 13.0 LMP would unnecessarily require patients at 13.1 through 13.6 LMP to go to a Level II facility, even if a Level I facility was closer and otherwise preferable, and to have unnecessary IV lines and pregnancy tests.

At oral argument, though, the defendants represented unequivocally that this is not what the statute means.  They said the "end of the 11th week of gestation" is 11 weeks, 6 days after conception—the same as 13 weeks, 6 days after LMP.  Based on that representation, this order denies relief on this claim.  The defendants should take note: this representation has been the direct cause of this ruling, sufficient to judicially estop the defendants (and the state) from later asserting otherwise.  The plaintiffs have acknowledged that with the statute clarified in this way, it is not unconstitutionally vague or otherwise subject to challenge in this action.

## VI. The Other Preliminary-Injunction Criteria

The plaintiffs have easily met the other prerequisites to a preliminary injunction.

First, if an injunction does not issue, the plaintiffs will be forced for unconstitutional reasons to dismantle programs unrelated to abortions and will be required to submit to unconstitutional inspections of their abortion clinics. They will have no redress. This is irreparable harm.

Second, an injunction will cause no damage to the defendants. Quite the contrary. The defendants will benefit, not suffer damage, from non-abortion-related services that the plaintiffs have long provided without complaint. The defendants will still be able to perform adequate inspections of the plaintiffs' clinics and will be relieved of the duty to perform excessive inspections for no legitimate reason. And even if there is harm to the defendants—they may have to dismantle efforts they have undertaken to replace the programs the plaintiffs will be able to continue—the threatened constitutional injury to the plaintiffs far outweighs the harm to the defendants.

Finally, an injunction will serve the public interest. Vindicating constitutional rights is itself a public interest. And avoiding the disruption that would come from terminating the plaintiffs' non-abortion-related programs but later reinstating them will serve the public interest. Avoiding the unnecessary

disclosure of thousands of patients' confidential medical records serves the public interest.

## VII. Security

Federal Rule of Civil Procedure 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Eleventh Circuit has said "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.' "  *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Svs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)).

Here the likelihood that the defendants will suffer compensable costs and damages, even if this injunction is later held wrongful, is slight.  This order requires the plaintiffs to provide security in the amount of $5,000.  The plaintiffs may provide security through a cash or surety bond or, if the defendants consent, by filing an unsecured undertaking to pay the defendants' costs and damages, if they are found to have been unlawfully enjoined, up to that amount.

# VIII. Conclusion

Two challenged provisions of the amended Florida abortion statute are unconstitutional, and the plaintiffs have met the prerequisites to a preliminary injunction.  Accordingly,

IT IS ORDERED:

1.  The plaintiffs' motion for a preliminary injunction, ECF No. 5, is granted in part.

2.  The defendants must not act or refuse to act in any manner based on Florida Statutes § 390.0111(15) or the second sentence of Florida Statutes § 390.012(1)(c)2, as amended by Laws of Florida, chapter 16-150 ("the enjoined provisions").  The defendants must not terminate any grant, contract, or other funding device based on the enjoined provisions and must not fail to renew any grant, contract, or other funding device that, but for the enjoined provisions, would have been renewed or would be renewed.

3.  This injunction will remain in place until entry of a final judgment in this action or until otherwise ordered.

4.  This injunction binds the defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

5.   This injunction is effective immediately but will lapse without further order on July 7, 2016, at 5:00 p.m., unless, by that time, the plaintiffs have given security in the amount of $5,000 to pay the costs and damages sustained by any party found to have been wrongfully enjoined.

SO ORDERED on June 30, 2016.

s/Robert L. Hinkle
United States District Judge